**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARMINDER BAJAJ,<br><br>    *Plaintiff*,<br><br>  v.<br><br>SCOTT TURNER,[1] *et al.*,<br>*in his official capacity as Secretary and Head*<br>*of the United States Department of Housing*<br>*and Urban Development*,<br><br>    *Defendants.* | Civil Action No. 21-1149 (RDM) |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Parminder Bajaj brings this action against the United States Department of Housing and Urban Development ("HUD") and the Secretary of Housing and Urban Development, alleging race, sex, national origin, and age discrimination; failure to accommodate; hostile work environment; and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e *et seq*., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq*. In a prior decision, the Court granted in part and denied in part Defendants' motion to dismiss. Dkt. 13. The parties have now completed discovery, and Defendants have moved for summary judgment on the remaining claims. Dkt. 30.

For the reasons explained below, the Court will **GRANT** that motion.

---

[1] Scott Turner is automatically substituted for Marcia Fudge as the defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

# I. BACKGROUND

## A.    Factual Background

For purposes of resolving Defendants' motion for summary judgment, the Court considers the following facts in the light most favorable to Bajaj, as the non-moving party, and relies only on those facts that are reasonably uncontroverted.  *See Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017).

### 1.

On October 1, 2016, Plaintiff Pariminder Bajaj began working for HUD as an IT Specialist in the Office of Public and Indian Housing.  Dkt. 34-1 at 1 (SUMF Resp. ¶ 2).  Bajaj is a woman of Asian descent, she was born in India, and she was over the age of 40 when the relevant events occurred.  *Id*.  (SUMF Resp. ¶ 1).  The parties agree that she suffers from "a chronic ailment," which, as Bajaj explains, was caused by an injury to her left arm, which she sustained while on "active duty in the military."  Dkt. 34-1 at 15 (SUMF Resp. ¶ 57).  That injury "left her with screws, rods, blades, and metal in her arm."  *Id.*

From October 1, 2016 until April 1, 2018, and, then again, from October 1, 2018 until February 25, 2019, Bajaj's "first line supervisor" was Kevin Portanova.  *Id.* at 1 (SUMF Resp. ¶ 3).  From April 1, 2018 until September 30, 2018, her first line supervisor was Patrick Evans. *Id.* at 2 (SUMF Resp. ¶ 5).  Evans also served as Bajaj's "second line supervisor" from October 1, 2018 until February 2, 2019.  *Id.*  Other IT Specialists who worked with Bajaj included Shyni Dennis and Bella Kumari, both of whom are also Indian women (although Bajaj stresses that she is from Northern India, and Dennis and Kumari are from Southern India).  *Id.* at 2–3 (SUMF Resp. ¶¶ 8, 10, 11).  Dennis, like Bajaj, was over 40 years old.  *Id.* (SUMF Resp. ¶ 9).  Finally, Eric Krapf also worked as an IT Specialist and served as the "Scrum Master" among the IT staff

for the Office of Public and Indian Housing.  *Id.* at 3 (SUMF Resp. ¶ 13).  He was also over 40

years old.  *Id.* (SUMF Resp. ¶ 14).

According to Bajaj, her difficulties at HUD began when she started to experience

"bullying and stalking by co-workers."  *Id.* at 3 (SUMF Resp. ¶ 16).  The timeline of the relevant

events is, to say the least, confused.  At deposition, Bajaj testified that her problems at HUD

began in 2017, just a few months after she started, when she was "forced . . . to work with

stalkers and bullies."  Dkt. 30-2 at 29 (Bajaj Dep. 29:1–5).  In responding to Defendants'

Statement of Undisputed Material Facts, however, Bajaj admits that she began "experiencing

bullying and stalking by co-workers" "in or around February of 2018."  Dkt. 34-1 at 3 (SUMF

Resp. ¶ 6).  To make matters worse, it is far from clear in what order Bajaj contends the relevant

events occurred.  In an effort to discern some timeline—even if an imperfect one—the Court will

track the description of the relevant events that Bajaj provided in her deposition.

Bajaj testified that her first few months at HUD started off "okay."  Dkt. 30-2 at 25 (Bajaj

Dep. 25:5).  She started with a promotion (to GS-14) from her prior government job, and

Portanova "really wanted" Bajaj to take the job.  *Id.* at 24–25 (Bajaj Dep. 24:17–25:1).  But after

a few months, "everything started going downward."  *Id.* at 25 (Bajaj Dep. 25:5–21).  Bajaj

perceived "too much negativity" and "too much favoritism" on her team.  *Id.*  Unlike others,

Bajaj was "not th[e] type of person" to "kiss[] . . . Portanova's shoes," and she "started [to] feel[]

that [she] was given the horrible assignments."  *Id.* (Bajaj Dep. 25:17–23).  Bajaj was also

unhappy with the location of her office, which "everyone was passing by whenever they were

going" anywhere else.  *Id.* at 27 (Bajaj Dep. 27:9–23).  As she explained at her deposition, she

"get[s] migraines when [she] see[s] . . . people walk very fast and all [the] time, like there were

one, two, three, four [or] five people in [her] area," who were "going out, coming in, going out,

coming in," thereby preventing her from concentrating.  *Id.*  She further explained that she

"like[s] to read [the] Bible . . . during lunchtime" and did not "like [it] when people [were]

passing [her] when [she was] read[ing] [the] Bible."  *Id.* at 28 (Bajaj Dep. 28:6–8).

Early during her time at HUD, Bajaj began to view Shyni Dennis as "a stalker."  *Id.* at 26

(Bajaj Dep. 26:3–18).  The alleged stalking consisted of Dennis "always, always talking to"

Bajaj and coming "behind" her to look "at what [Bajaj] [was] working on."  *Id.* at 28 (Bajaj Dep.

28:9–12).  According to Bajaj, Dennis was "invading [her] space," *id.* (Bajaj Dep. 28:13–14);

"had no business to come and look at [her] computer" and to see what she was doing, *id.* (Bajaj

Dep. 28:14–18); and "was unnecessarily in [her] cubical," *id.* at 26 (Bajaj Dep. 26:6–8).  On

Bajaj's telling, Dennis "stalk[ed] [her] everywhere," when Bajaj was "on the first floor," Dennis

was there; when Bajaj was "on the third floor," Dennis was there; when Bajaj went to "the

restroom," Dennis was there; and when Bajaj went "out to get food, she [was] there."  *Id.* at 29

(Bajaj Dep. 29:14–21).  Bajaj further testified that she was "very fearful" of Dennis and did not

"want to work with her."  *Id.* at 28–29 (Bajaj Dep. 28:23–29:1).  When Bajaj indicated that she

did not want to work with Dennis, she was told that she would have to work with her.  *Id.* at 30

(Bajaj Dep. 30:19–22).  Bajaj, in turn, responded, "I am not going to work with her.  She makes

me sick."  *Id.*  According to Defendants, when Bajaj complained about Dennis, Evans conducted

an "informal investigation in March of 2018" but "found no evidence . . . that [Bajaj's]

allegations were true."  Dkt. 30-9 at 3–4 (Evans Aff. ¶¶ 14–15).  Evans attests that he

nevertheless honored Bajaj's request that she be placed on a different team from Dennis.  *Id.* at 4

(Evans Aff. ¶ 15).

Bajaj's interactions with Eric Krapf were equally fraught.  In Bajaj's view, Krapf was a

"business guy," who "didn't know anything [about] IT."  Dkt. 30-2 at 30 (Bajaj Dep. 30:1–15).

At some point, Bajaj was "told to train" Krapf and Dennis, so she "gave them [a] two hour[]

[and] ten minute[] presentation," at which Krapf "sucked everything out of [her], learned

everything from [her]," only to "bang[] the phone" and to "c[o]me to [her] cubical" and to "yell[]

at [her]." *Id.* at 30–31 (Bajaj Dep. 30:23–31:9).  To make matters worse, according to Bajaj,

Krapf then "made vulgar gestures, which were very uncomfortable and unwelcome for [her]."

*Id.*  When asked at deposition to describe these gestures, Bajaj simply said that "he was moving

his arms in very vulgar ways" and that "[h]e was moving his hands up and down in places []he

should not be moving his hands." *Id.* at 32 (Bajaj Dep. 32:8–22).  In addition, according to

Bajaj, Krapf "was even cursing [her]." *Id.* at 33 (Bajaj Dep. 33:10–13).

Bajaj then ventured, without a question from counsel, to address "[w]hy [Krapf] [was]

angry," concluding that it was "[b]ecause he is not an IT person and he did not gr[asp] anything

[that] I said" during the training session. *Id.* at 33 (Bajaj Dep. 33:14–16).  Bajaj further

explained that Portanova "forced" her to train Krapf and Dennis, even though they "could have

learned" what they needed to know by "watch[ing] YouTube videos." *Id.* (Bajaj Dep. 33:17–

19).  When Krapf complained that the screenshots that Bajaj used in the training came from a

"Mac" and were therefore "useless" to him (since he used "Windows"), Bajaj responded by

saying, "I [do] not work for you, . . . I . . . work[] for myself," and "You should be thankful

whatever I'm giving you," since "[i]t's not my job to [train] you." *Id.* at 33–34 (Bajaj Dep.

33:25–34:8).  Finally, Bajaj complained that, after these events, Krapf "would not even look

towards [her]" at meetings. *Id.* at 31 (Bajaj Dep. 33:11–12).

Bajaj further asserts that, when she "filed complaints" with Evans and Portanova about

Krapf's "bullying," she was told (in an email that Krapf received as well) that she was being

"petty" and "unprofessional."  Dkt. 34-1 at 23 (SUMF Resp. ¶ 3); Dkt. 32-1 at 43 (Bajaj Aff.

¶ 38).  In contrast, Evans attests that "when [he] look[ed] into [Bajaj's] allegations" regarding Krapf's bullying, Bajaj "state[d], 'You can see in the emails I forwarded you that I never had any problem with anyone . . . except'" for Dennis.  Dkt. 30-9 at 4 (Evans Aff. ¶ 20).  Bajaj also alleges that Evans would scream and yell at her so loudly that it disturbed other employees on the floor, Dkt. 30-2 at 59 (Bajaj Dep. 59:16–25), an allegation that Evans also denies, Dkt. 30-9 at 4 (Evans Aff. ¶ 16).

In Bajaj's administrative complaint, she alleged that Portanova and Evans "repeatedly berated and criticized [her]" for her "gender, age, disability, and accent/grammar."  Dkt. 32-3 at 1 (Admin. Compl. ¶ 8).  She alleged, for example, that her supervisors, as well as Krapf, "criticized [her] week after week about [her] English;" that Evans, at one point, said that he had "to read [her] emails many times to understand what [she] was saying" and said that "there are many grammatical mistakes;" and that, on another occasion, Evans slammed "his fist on a table and scream[ed] at [her] for [her] English grammar" and told her "that [she] had better spell check before sending an email."  *Id* (Admin. Compl. ¶ 9); *see also id*. at 4, 5 (Admin. Compl. ¶¶ 8, 10, 27).

Although Bajaj could not recall certain details, she also testified at deposition that, on two occasions, Evans said that "white guys are so much better than black guys;" that he "maybe" said that "white women are better than black guys;" and that he said that a "colored woman is at the bottom."  Dkt. 30-2 at 119–120 (Bajaj Dep. 119:22–120:8).  He also allegedly said that when he came from Great Britian, he "did not want to take any orders from [a] woman," and he "ma[de] fun of" a woman "wearing a hijab."  *Id.* at 119 (Bajaj Dep. 119:17–20).  According to Bajaj, on the first occasion, Portanova and Bella Kumari were present, and Portanova laughed at the comments.  Evans also said, according to Bajaj, that white men "can get away with anything"

and "will not even be caught." *Id.* at 121 (Bajaj Dep. 121:7–18). When asked for details, Bajaj said that she was "getting confused" and that it was "all getting mixed together for" her, but she recalled the conversation occurring at a coffee shop at some point in time before she was moved to the FEMA project (discussed below) on May 1, 2018. *Id.* at 121–123 (Bajaj Dep. 121:19–123:4).

On the second occasion, according to Bajaj, no one other than Evans and her were present. *Id.* at 123 (Bajaj Dep. 123:5–17). Bajaj could not recall when the conversation occurred—or even whether it was before or after she was moved to the FEMA project. *Id.* (Bajaj Dep. 123:18–20). But she recalls that Evans "said the same things" again, asserting that white men "can get away with anything." *Id.* at 123–124 (Bajaj Dep. 123:21–124:8). As Bajaj understood the comment, Evans was telling her "don't ever mess with me . . . I'm a white guy." *Id.* at 124 (Bajaj Dep. 124:1–20).

When asked about these statements at his deposition, Evans denied Bajaj's allegations. He denied ever comparing "white men with black men or with colored men or women." Dkt. 30-3 at 54 (Evans Dep. 54:9–16). He denied every "taking to . . . Bajaj about wom[e]n who wear[] headscarf[s]" and noted that his daughter is Muslim. *Id.* at 54–55 (Evans Dep. 54:17–55:6). And he denied ever speaking to Bajaj about her use of the English language or telling her to make sure to use spellcheck (which, as he explained, is not even a separate option in the email program but, rather, works as part of the ordinary email operation). *Id.* at 55–56 (Bajaj Dep. 55:7–56:19).

## 2.

Over a period of several months, Bajaj sent and received various email messages relating to her complaints. Given the lack of temporal clarity in her allegations, however, the Court can

only roughly correlate this correspondence with the events discussed above.  The

correspondence, in any event, confirms that Bajaj had a contentious working relationship with

Krapf and her supervisors from early on.  On February 2, 2018, for example, Krapf sent an email

to Bajaj (and cc'd Portanova and others) admonishing her for failing to provide the "team" with

"advance notification" when she "cannot attend" a meeting.  Dkt. 30-14.  Less than two weeks

later, Portanova wrote to Bajaj, asserting that he had "never once called [her] a name" or "treated

[her] any differently than [anyone] else."  Dkt. 30-15.  At the same time, he observed that Bajaj

was "not contributing to [her] team, nor cooperating with them to get the team's commitments

completed" and that she had been warned "on multiple occasions that [she] could not work off

hours and not claim them."  *Id.*  A few days later, Bajaj complained that her team was

"mistreating" her, and Portanova, again, admonished Bajaj for failing to "communicate" and to

"participate" with her team.  Dkt. 30-16.

On March 12, 2018, Bajaj sent the following email to Portanova:

Kevin,

I tried to talk to you many times but every time you had some excuse and we never talked.  You removed Sumangala and Kabir (Which George didn't want) and that didn't fix the problem and you thought it will go away.

You are so unfair.  You didn't even ask me why did I say to Eric that he is unprofessional?  You started almost screaming at me in your email that I am Petty and Unprofessional without knowing what happened?  (Even included him in the email, Wow)[.]  A Person who comes to my cubicle, yells, screams, curses, intimidates is not unprofessional.  Right?

I feel so helpless.  I feel I am going though Mobbing.  What that means is bullying of me by a group.

Eric's problem also started because of Shyni.  I will never say anything without evidence.

The way you have started insulting/bullying/torturing me in front of the person I am talking about is proof enough that you encourage such bullies behavior and really know how to insult people and make them Sick.

You have created a very stressful, irksome and unpleasant environment for me. The atmosphere you have created for me is very unhealthy.

You have become a horror for me.  Your name also frightens me.  You are my Boss and I should be comfortable talking to you, But you thought is also daunting.  You discriminate me all the time.  You are being hostile towards me for no reason.

I had to take it out so that you know how your behavior makes me feel.

Thanks,
Parminder

Dkt. 30-17 at 1.

Not long after that, Bajaj engaged in an email exchange with Evans in which she asked him to "[p]lease consider transferring [her] to a different project," because it was "very unhealthy [for her] to work with [her existing] team."  Dkt. 30-20 at 13. She also complained that Portanova's "decision [was] robbing [her] of [her] health," adding: "How can an employee be efficient when she is mobbed not only by her co-workers but including her boss too?"  *Id.* at 11.  In response, Evans encouraged her not to "think about what [Krapf or Dennis] did [or] did not say" and, instead, to focus on her work and to let her "work speak for itself."  *Id.* at 10.  Bajaj, again, complained about her "toxic" work environment, about Krapf's "cursing and abusing" behavior, and about Portanova's criticism of her allegedly "[p]etty and [u]nprofessional" behavior.  *Id.* at 4.  She ended her lengthy email with yet another plea "to please transfer [her] to a different project."  *Id.*

Later in March 2018, Kumari and Dennis sent separate emails to Evans and Portanova complaining about Bajaj's "rude" and "accusatory" conduct during a

meeting.  Dkt. 30-21; Dkt. 30-22.  Kumari closed her email as follows: "The hostile nature of the meeting made me feel sad and uncomfortable," and "I am sincerely hoping that this does not happen again."  Dkt. 30-21.  Sounding a similar note, Dennis wrote: "I have done my best to share all my knowledge with her but she tries to throw blame on the team for not sharing.  I felt sad and attacked by her rude behavior[,] and it was a very unpleasant day for me."  Dkt. 30-22.

Finally, on May 1, 2018, Evans agreed to move Bajaj to "a new project, which was the FEMA project."  Dkt. 34-1 at 7 (SUMF Resp. ¶ 28).  As Evans explained during the administrative investigation, he investigated Bajaj's allegations of bullying and a hostile work environment—including meeting with Bajaj and interviewing "independent witnesses who would have been present during the alleged incidents"—but found no evidence that she "was subjected to a hostile work environment by [Portanova] or anyone else in the office."  Dkt. 30-9 at 1–2 (Evans Aff. ¶¶ 4–5).  He did find, however, that Bajaj "was non-cooperative and [was] unwilling to work with her team."  *Id.* at 2 (Evans Aff. ¶ 5).  But "[d]espite [his] findings that [Bajaj's] allegations were not substantiated," he nonetheless "agreed to move [her] off of her current team and on to a special FEMA project," hoping that the move might "help her to improve her mid-year evaluation" in which Portanova had rated her performance on the "collaboration element" as "unacceptable."  *Id.*

Portanova formally issued Bajaj's mid-year evaluation three weeks later, on May 21, 2018.  Dkt. 30-24.  On that review, Bajaj "received a 1 out of 5 (unsuccessful) on the collaboration element," and "a 3 out of 5 (fully successful) on the remaining elements of the review."  Dkt. 34-1 at 8 (SUMF Resp. ¶ 30).  With respect to the collaboration element, Portanova observed that Bajaj had failed to collaborate and communicate with her development

team, resulting in "a significant negative impact on [the] team, as well as other teams."  Dkt. 30-24 at 7.  He recommended that she "focus on harboring and building relationships with the team members and displaying a cooperative and harmonious nature."  *Id.*

**3.**

At first, Bajaj was thrilled by the move to the FEMA project.  She wrote Evans:

> Nothing I can say will ever convey the amount of gratitude I owe to you for showing me that you do care about me.  Working for you is an honor.  Working under you is a pleasure, an experience that I will truly treasure.  THANK YOU VERY MUCH. GOD BLESS YOU.

Dkt. 30-23 at 1.  But that sentiment did not last long, largely due to her asserted lack of training on the relevant IT platforms.  According to Bajaj, she "did not have the JAVA or SOAP skills needed to work on the FEMA projects, nor was she provided with training when requested."  Dkt. 34-1 at 8 (SUMF Resp. ¶ 33).  Bajaj expressed difficulty with the tasks assigned to her in late May, Dkt. 30-26 at 1, and early June 2018, Dkt. 30-28 at 1.  On May 25, Bajaj emailed Evans asserting, among other things, that somebody "need[ed] to show [her], at least once about the tasks that ha[d] been assigned" to her.  Dkt. 34-1 at 9 (SUMF Resp. ¶ 34); Dkt. 30-26 at 1.  And after Evans expressed dissatisfaction with Bajaj's performance on June 4, 2018, noting that she was "still heavily relying on the rest of the team to p[erform] tasks that as a team member you should already know how to perform," Dkt. 34-1 at 9 (SUMF Resp. ¶ 34); Dkt. 30-28 at 1, Bajaj replied that she could do the project but "still need[ed] some help" because "[n]o one [was] doing any tasks for [her]," Dkt. 34-1 at 9 (SUMF Resp. ¶ 36).

About a week later, on a Monday, Bajaj sent an email to Evans requesting to take the day off.  Dkt. 30-29 at 2.  She explained that the prior Friday had been "very stressful for" her and that the "intimidating and hostile environment" at HUD was a "shock for" her.  *Id.*  Due to the "shock," Bajaj wrote, she did not "even have the strength to go to [the] VA Hospital" and wanted

11

"to relax" for the day.  *Id.*  She added: "You agreeing with Kevin is very scary and stressful for me and I will be better off if I am not working on the FEMA Project."  *Id.*  Evans responded by noting that Bajaj was "continually ask[ing] for special treatment, demanding other staff help [her] perform [her] work, blaming others, and creating a hostile environment for them."  *Id.* at 1. The following day, Bajaj asked with apparent incredulity, "[a]m I the one who is creating hostile environment for others?"  *Id.*  She then told Evans: "I am capable of learning and completing this FEMA project but I surely don't have the skills to go through your politics.  I can't tolerate this politics."  *Id.* (emphasis removed).

The situation only became more acrimonious when Evans emailed Bajaj moments later, expressing extreme disappointment that, "after [he] gave [her] this opportunity[,] [she] was still struggling to provide [him] with accurate status of the project," and directing that she provide "by COB Monday" an update "and a realistic assessment if [she had] the necessary experience to complete this project without relying on other team members."  Dkt. 30-31.  He added: "If you do not have that experience, I need you to document exactly what assistance you require," or "if you feel [that] this project is something that you cannot complete in a reasonable timeframe, even with assistance, I need to know that."  *Id.*  Evans copied Kevin Portanova on that email.  A minute later, Bajaj sent Evans an email, stating: "Patrick, Very Nice!  Kevin sends my emails to Eric and you send my emails to Kevin.  How would you want me to trust Management?"  Dkt. 34-1 at 9 (SUMF Resp. ¶ 39); Dkt. 30-30 at 1.  She then responded to the substance of Evans' email, simply asserting: "I will brief you in person."  Dkt. 30-31.

The following day, Evans sent an email to Bajaj offering a path forward, including additional training and assistance:

Parminder,

Thank you for yesterday's briefing, unfortunately neither Claudia nor I understood the status of the project. Even though your Position Description clearly states that you should be able to work independently with only high level guidance from your supervisor, I am going to provide you the following assistance and guidance to help you collaborate more effectively with both internal (PD&R) and external (FEMA) stakeholders.

. . . .

To respond to your other concerns, training, assistance etc. Again I will remind you that there are set procedures and "team norms" that should be followed. As with all other projects, there are research stories, research spikes etc, these fully document what is needed and what the acceptance criteria are for that research. If you need to perform this research, those stories should be in the backlog and included in the sprint planning. Vague emails for "training" does not follow the process. As for the access to training, PIHJT have access to the Lynda online training portal, you should be able to find the information you require for the research stories there.

To address your concern [that] "SOAP" is an obsolete/old technology[,] and you need assistance. Again that assistance should be documented as a research story. Also[,] I have obtained the support of the FEMA developer that created that original to assist you.

. . . .

Everything I am requesting/advising in this email is consistent with the "team norms" for scrum agile projects. It is what I receive from other scrum masters for their projects.

Dkt. 30-32 at 2. In response, Bajaj once again indicated that she "would prefer that [Evans] assign this project to someone else" and explained that she did not "have the time to learn and [to] perform at the same time." *Id.* at 1.

The parties differ over whether Bajaj was provided the necessary training to do what was asked of her. On the one hand, Defendants stress that Bajaj had logged over 151 hours of training from HUD's online training platform, Lynda.com, by July 19, 2018. Dkt. 34-1 at 11 (SUMF Resp. ¶ 41); Dkt. 30-33 at 1. In addition, she had taken "at least 14 training courses in JAVA." Dkt. 34-1 at 12 (SUMF Resp. ¶ 42); Dkt. 8-2 at 36–38; Dkt. 30-2 at 78 (Bajaj Dep.

78:2–18).  Based on that training, Bajaj stated in her mid-year review that "[she] will be ready to work in J[AVA] when the right opportunity knocks at my door."  Dkt. 8-2 at 38.  On the other hand, Bajaj asserts that the training that she received was not "practical training" and, instead, provided her with only "theoretical knowledge."  Dkt. 34-1 at 12 (SUMF Resp. ¶ 41).  For the FEMA project, moreover, Bajaj asserts that "SOAP web services skills" were required, but she was not given that assistance.  Dkt. 34-1 at 25 (SUMF Resp. ¶ 12).  Defendants, in turn, note that Evans offered precisely that assistance in the email quoted above.  Dkt. 34-1 at 12 (SUMF Resp. ¶ 44).

### 4.

As Bajaj's difficulties continued, Evans issued her an Opportunity to Improve Notice ("OIN") on July 31, 2018.  Dkt. 34-1 at 12 (SUMF Resp. ¶ 45); Dkt. 30-35.  The notice indicated that Bajaj's performance on "Critical Element #1, Collaboration," remained unacceptable.  Dkt. 30-35 at 1 ("currently at the Unacceptable level").  HUD's Performance Management Plan provides that "[a]n opportunity to improve notice may be given to an employee at any time during the appraisal period when his/her performance becomes [l]evel one."  Dkt. 30-64 at 26.  Bajaj was warned that she "must improve [her] performance on Critical Element #1;" that "[d]ue to [her] unacceptable performance[,] [her] telework [would] be suspended" starting on August 19, 2018; and that she "may be subject to a removal or reduction-in-grade action" if her performance did not improve.  Dkt. 30-35 at 5.

After receiving the OIN, Bajaj simply stopped reporting to work in person.  Dkt. 34-1 at 13 (SUMF Resp. ¶ 48); Dkt. 30-2 at 55 (Bajaj Dep. 55:11–16) ("I did not come to [the] office even for a single day after July 31st, 2018.").  According to Bajaj, she stopped coming into the office because she was "fearful of [her] life."  *Id*.; *see also* Dkt. 34-1 at 13 (SUMF Resp. ¶ 48).

14

Bajaj's failure to report in-person to work rendered HUD's telework policies applicable.  Under HUD's telework policy, however, "[e]mployees working under an OIP [Opportunity to Improve Plan], PIP [Performance Improvement Plan] or on leave restriction are ineligible to participate in" the program, *id.* at 14 (SUMF Resp. ¶ 50), and Bajaj's OIN incorporated that limitation, *id*. at 13 (SUMF Resp. ¶ 49).

On the same day that she received the OIN, Bajaj emailed Evans requesting permission to go on "negative leave" starting the following day, citing the "unhealthy" work environment and indicating that she was tired of the "bullying behavior and harassment" she faced in the "very Hostile [work] Environment."  Dkt. 30-34 at 1–2.  Evans responded, "I understand you are upset, so I approve you to take leave tomorrow."  *Id.* at 1.  But he went on to ask: "As you do not have any sick leave, do you wish to take annual leave, use your time off award,[2] or take leave without pay."  *Id.*  Bajaj rejected each of those options and, instead, repeated her request "to go on negative leave."  *Id.*

Then, on August 2, 2018, Bajaj submitted a one-sentence doctor's note that sought to excuse her from work from August 1 to August 8, 2018, "[d]ue to her severe worsening left arm."  Dkt. 30-36.  She then emailed Evans that HUD did not "need to pay [her] anything" and that he did not "have to approve [any] Advanced Sick Leave."  Dkt. 30-37.  She repeated the accusations of bulling and a toxic work environment, but this time added: "Employers are prohibited from discriminating based on race, gender, color, nationality or religion and you thought HUD is an exception.  I have been bullied, mobbed and harassed every single day."  *Id.*

---

[2] Bajaj was awarded a Time Off award in 2017 that "gave her the option to receive three additional days of pay or three additional days of leave."  Dkt. 34-1 at 32 (SUMF Resp. ¶ 34).

She then asserted that she would "not be coming to this unhealthy environment very soon[,] and I will be needing a lot of leave so I don't want to use my annual leave." *Id.*

To request leave, Bajaj was required to use HUD's "automated time and attendance system." Dkt. 34-1 at 16 (SUMF Resp. ¶ 58); Dkt. 30-66 at 2. HUD's Absence and Leave policy provides:

> Sick leave may not be advanced if . . . (5) Chronic ailments have necessitated the employee's absences in the past [and] . . . Regardless of the circumstances, an employee does not have a right to an advance. Approval of the request is at the direction of the approving official.

Dkt. 30-61 at 17. The collective bargaining agreement between HUD and the American Federation of Government, AFL-CIO echoes this requirement and provides:

> Requests for advanced sick leave may be approved at the discretion of the approving official, based on the above, except in certain situations including but not limited to the following . . . (e) Chronic ailments have necessitated the employee's absences in the past, and are expected to continue.

*See* Union Agreement, Dkt. 30-66 at 4.

On August 7, 2018, Bajaj submitted another doctor's note, this time seeking to be excused from work from August 10 to August 28, 2018, for "cervical radiculopathy." Dkt. 34-1 at 16 (SUMF Resp. ¶ 60); Dkt. 30-38. The next day, August 8, 2018, Bajaj contacted an Equal Employment Opportuniy ("EEO") counselor, claiming that Krapf had bullied her; that Portanova and Evans had failed to intervene and had called her "petty and unprofessional;" that her managers had refused to move her to another project after she complained that Dennis was stalking her; that she was removed from one project and placed on another, "where she had no knowledge or skills" to perform the necessary work; that she received an unsatisfactory rating for collaboration on her mid-year performance evaluation and, as a result, was not permitted to

telework; that she was placed on an OIP; and that she was charged for leave without pay when she was taking a training course at home. Dkt. 30-9 at 5–10.

Then, on August 25, 2018, Bajaj emailed her union representative, Mark Matulef, complaining that she "didn't receive [her] pay [that day]." Dkt. 30-40 at 4. She asked "[w]hy have I not be[en] paid?" *Id.* The matter was escalated to Evans, who informed another union representative, Delton Nichols, that:

> Parminder provided a doctor's note for leave until August 28th, as she did not have any remaining sick leave (actually negative), I offered her the choice of using vacation, a time off award from 2017, and/or leave without pay. She elected not to use her vacation or time off award. On Monday 20th August, Mark Matulef from the union send me an email asking to use her annual leave, unfortunately it was too late for that pay period, and I agreed to ask the master time keeper to mark it that way for the next pay period. See attached. She has not applied for FMLA, although that would not have changed the result.

Dkt. 30-40 at 1.

On August 28, 2018, Bajaj submitted an additional doctor's note, seeking to excuse her from working from August 28 to September 12, 2018. Dkt. 30-41. For this period, HUD treated her as on leave without pay ("LWOP") to the extent she did not use her annual leave. Dkt. 34-1 at 17 (SUMF Resp. ¶ 65); Dkt. 30-9 at 3. Near the end of that period, on September 11, 2018, Bajaj submitted another doctor's note requesting permission to telework beginning on September 13, 2018. Dkt. 34-1 at 17 (SUMF Resp. ¶ 66); Dkt. 30-42. On September 12, 2018, Bajaj emailed Evans indicating that she would not be coming into the office; that she had "already given [Evans] [her] Doctor's documentation for reasonable accommodation;" and that Evans "ha[d] not approved [her] reasonable accommodation so [she] w[ould] be on medical leave." Dkt. 30-43 at 2–3. Evans responded that he had not "received a medical note stating [Bajaj] need[ed] additional medical leave" and that he would need that information to "grant [Bajaj] additional LWOP." *Id.* at 2. He continued that: "Unless I hear differently[,] [I] will follow your

previous direction and use vacation and then LWOP.  If you wish to use your time off award you will need to let me know that before Friday COB."  *Id.*[3]

On September 12, 2018, Bajaj sent Evans an email asserting, "I have already given you my Doctor's documentation for reasonable accommodation," and because "[y]ou have not approved my [request for a] reasonable accommodation[,] . . . I will be on medical leave."  Dkt. 30-43 at 3.  Evans responded:

> I have not received a medical note stating you need additional medical leave.  I will need that to be able to grant you additional LWOP.  Please ensure I receive this before COB Friday in order for me to accurately record your time.  Unless I hear differently[,] I will follow your previous direction and use vacation and then LWOP. If you wish to use your time off award you will need to let me know that before Friday COB.

> You may want to speak to Mark [her union representative] about reasonable accommodation and the OIP processes in the Federal Government.  There are set processes that you need to follow to which I have no authority to change. You might also speak to Mark about the Union contract, a lot of what you are asking me does not comply with the Union [c]ontract.  Again[,] I have no authority to change.

*Id.* at 2.  Bajaj did not—and does not—dispute that Evans lacked authority to approve a reasonable accommodation.  She, instead, merely asked Evans to complete a portion of her application under the Family and Medical Leave Act ("FMLA") leave.  *Id*. at 1-2.  Evans promptly filled in the requested information and sent the form to Bajaj's union representative. Dkt. 30-9 at 3 (Evans Aff. ¶ 11); Dkt. 30-44; Dkt. 30-45.  Bajaj's doctor also completed a portion of the form, noting that she was continuing to suffer from "chronic and worsening pain" resulting

---

[3] Bajaj asserts that she requested to use her Time Off award and that her request was denied. Dkt. 34-1 at 32–33 (SUMF Resp. ¶ 35).  According to Bajaj, her union representative informed her that Evans "contacted HUD Human Resources and had the timecard changed so [Bajaj] did not get" to use her time off award.  *Id.* at 33 (SUMF Resp. ¶ 35).  As explained further below, that contention is based on unsupported hearsay and is contrary to the uncontroverted documentary evidence.  *Id.* (SUMF Resp ¶ 35) (citing record).

from an injury to her left arm, which she suffered while on active duty.  Dkt. 30-45 at 2–3.  The

parties dispute, however, whether Bajaj (or anyone acting on her behalf) ever submitted the form

requesting leave under the FMLA.  *See* Dkt. 30-12 (Potter Aff. ¶ 4) ("A search of the network

storage drive for a request for Family and Medical Leave for . . .  Bajaj did not return any

results."); *but see* Dkt. 30-2 at 128 (Bajaj Dep. 128:7–10) ("I had applied under FMLA like I

could have applied for my reasonable accommodation and if my doctor can fill the forms,

whatever he was supposed to fill for FMLA why I needed these reasonable accommodations

there.").

Several days later, on September 26, 2018, Bajaj's union representation emailed Donald

Lavoy, the Deputy Assistant Secretary for HUD's Real Estate Assessment Center, seeking

"reconsideration of Mr. Evans's reconsideration of his denial of a work at home reasonable

accommodation request."  Dkt. 30-46 at 2.  In response, Lavoy agreed to "grant the four weeks

of reasonable accommodation."  *Id.*  But in an email on which Bajaj was copied, he also

"advised" the union representative that, "based on her past performance, . . . Bajaj will be issued

a[] [second] Opportunity to Improve Program notice this week."  *Id.*  Bajaj responded to Lavoy:

> DJ,
>
> Mr. Evans can't give me OIP because I complained about a Bully and a Stalker.
> If he will give me OIP, he has to show me Eric Krapf and Shyni Dennis
> Performance appraisal.  Mr. Evans can't abuse his power.
>
> My Performance was Exceeding and Outstanding in my 2017 performance
> appraisal.  This OIP is not acceptable to me.
>
> Mr. Evans has to suspend this OIP.  Also, I will not come to the office and put
> my life in danger under his supervision.
>
> Thanks,
> Parminder

*Id.* at 1.

Bajaj's position about whether she received the requested four-week accommodation is difficult to follow.  Although Bajaj was on the email chain in which the accommodation was approved, she contends that it was never properly conveyed (or, perhaps, although it is unclear, it was never implemented).  Her testimony is as follows:

> Q.     And [Lavoy] says I am considering your request and will grant the four weeks of reasonable accommodation that is requested.  Did I read that correctly?
>
> A.     Yes.  But I was not sent this email by Patrick or Kevin.  They sent this email.  They are so horrible.  They sent this email to my official email, Parminder.Bajaj@HUD.gov[,] and they knew that I didn't have any access to that email because Patrick had threatened me, if I'm not coming to the office and I try to log on my computer he is going to take disciplinary action.  So, I was not even checking those emails.
>
> Q.     You were not checking these emails?
>
> A.     No. The one that he had sent to my official email when I was not working.
>
> Q.     But you responded seven minutes later?
>
> A.     Who sent an email seven minutes later?
>
> Q.     I think you did.
>
> A.     Okay.  What did I write?  Or which one you want me to read?  Page 1?
>
> Q.     Yep.
>
> A.     Okay.  Okay.  I replied this too because of [Levoy's] email, not from Patrick or Kevin's email.
>
> Q.     I just want to be clear about something.
>
> A.     Okay.
>
> Q.     I know that one of your allegations is that you didn't receive a reasonable accommodation.
>
> A.     That is –

Q.     Is that correct?

A.     That is correct.

Q.     But it sounds to me like you did receive a reasonable accommodation. They just didn't email it to you the way you wanted to.  Is that correct?

A.     They put it on paper to save themselves but did not tell me that you have got that and you can – you got your approval for reasonable accommodation.

Q.     So, they should have – I'm trying to understand you.  You're saying they should have told you but not at your personal email address.  They should have told you at your work email address?

A.     No.  They were normally – whenever they wanted me to read any email they would send it by – to my personal email.  They will send it to my official email.  They will even send like letters by mail also, anything they wanted me to read.  But anything they didn't want me to read but they just wanted to play politics and dirty games, they will send it to my official email only so that they'll say, oh we had sent her an email where she did not have access.  She was threatened that you ever, when you're not working try to log on to your machine we will take disciplinary action against you.

Q.     Can we agree that you actually got your four weeks of your reasonable accommodation?

A.     No.  Only on paper.  I did not.

Q.     So, this is a lie.  Is that what you're saying?

A.     Yes.

Dkt. 30-2 at 130–32 (Bajaj Dep. 130:20–132:25).  In any event, Bajaj's request to work from home was quickly overtaken by other events.

As forewarned, the day after Levoy approved Bajaj's request to work from home for four weeks, Evans issued Bajaj a new Notice of Opportunity to Improve.  Dkt. 30-48.  Her OIP began immediately and applied for thirty days.  *Id.* at 5.  Bajaj was further informed that, at the end of that period, her performance would be evaluated again and that, if she did not improve her

"performance in "Critical Element #1, Collaboration[,] to at least the Minimally Successful level

by the conclusion of this OIP, . . . you may be subject to removal or reduction-in-grade action."

*Id.*  Bajaj responded to this OIN as follows:

> Mr. Evans,
>
> I would request you to stop harassing me while I am on leave.  I will be on leave indefinitely and I don't know for how long as I will not put my life and career in danger under Mr. Portanova's supervision or your supervision.  I will not return to this hostile, abusive and toxic environment.
>
> You two are the last persons I will ever trust.  You both will give me feedback?  That is a joke.  Complain to one and I get 1 rating and work like a dog and I get an OIP.
>
> People stab in the back but Mr. Evans you stabbed me in the front.  You are not a man of your words.  You put me on a SOAP Web Service Project and told me not one time but numerous times.  Parminder, just deliver me this project and I promise I will change your rating.  You made me work like a dog and then gave me an OIP because you felt like giving me.  Same way Mr. Portanova, I kept complaining about a Stalker and a Bully and rather than fixing them, you gave me rating 1 out of retaliation because of the email you had received from me.
>
> Let me remind you that there are still LAWS in this country and I will not let you both mob me, harass me, abuse me, discriminate me, retaliate against me.
>
> Once you release Eric Krapf and Shyni Dennis's performance appraisal then talk to me, otherwise, don't send me an email.
>
> You have damaged my glowing career, go ahead and do whatever you can do in your power.
>
> There will be a hostile work environment investigation very soon.
>
> Thanks,
> Parminder

Dkt. 30-47 (emphasis removed).

Bajaj then submitted two more doctor's notes requesting permission to telework, the first

from October 2 to November 13, 2018, Dkt. 30-50, and the second from November 14, 2018 and

continuing for 30 days, Dkt. 30-56.  At that point, Bajaj had been absent without leave from

September 12, 2018, and, despite her repeated requests to tele*work*, "she did not work during that time." Dkt. 34-1 at 20 (SUMF Resp. ¶ 80). Accordingly, in her November 2018 annual performance review, Bajaj received "a 1 out of 5 (unsuccessful) on all elements." *Id.* (SUMF Resp. ¶ 79); Dkt. 30-55. As to each element, Portanova wrote: "Would not participate in an OIP, cut off all communication with supervisor and 2nd level supervisor, went AWOL." Dkt. 30-55 at 5, 7, 8, 9, 11.

From December 22, 2018 to February 15, 2019, the federal government experienced a lapse in appropriations, requiring that HUD and other agencies implement a furlough. Dkt. 34-1 at 21 (SUMF Resp. ¶ 81). For purposes of determining pay and benefits during the lapse in appropriations, the Office of Personnel Management advised agencies that "[e]mployees who were on previously approved leave without pay (LWOP) or who were absent without leave (AWOL) during the lapse in appropriations will not receive pay for those hours." Dkt. 30-63 at 1. Bajaj, accordingly, did not receive furlough pay, although she asserts—without citing any evidence—that she did not receive pay during the lapse in appropriations because of discrimination and retaliation by her supervisors. Dkt. 34-1 at 21 (SUMF Resp. ¶ 83). She concedes, however, that she was not working during this period of time. *Id.* at 20–21 (SUMF Resp. ¶ 80).

On February 13, 2018, Bajaj was issued a Notice of Proposed Removal for Unacceptable Conduct Absent Without Leave, because "she had been in AWOL status for months." *Id.* at 21 (SUMF Resp. ¶ 84); Dkt. 30-58. Bajaj claims she was not AWOL because "she had doctor's notes for medical leave." Dkt. 34-1 at 21 (SUMF Resp. ¶ 84). But that assertion is neither correct nor even arguably consistent with the doctors' notes that she identifies. The last doctor's note that Bajaj identifies that indicated that she was "[u]nable to work" covered a period ending

on September 12, 2018.  Dkt. 30-41 (covering Aug. 28 to Sept. 12); *see also* Dkt. 30-8 (covering Aug. 10 to Aug. 28); Dkt. 30-36 (covering Aug. 1 to Aug. 10).  As a result, those letters do nothing to controvert the first charge contained in the Notice of Proposed Removal, which charged Bajaj with being AWOL from September 17 to September 28.  Dkt. 30-58 at 1.  All of the remaining letters, in contrast, merely sought permission to telework—not to stop working altogether.  See Dkt. 30-56; Dkt. 30-42; Dkt. 30-50.  Nor has Bajaj offered any evidence controverting the second charge in the Notice of Proposed Removal.  According to that charge, although Bajaj was "granted [a] temporary reasonable accommodation by the Deputy Assistant Secretary . . . to telework for 30 days," she was expected "to work from home beginning on the 27th September 2018" but failed to perform any work, either during that period or since then. Dkt. 30-58 at 1.  As Bajaj concedes, she performed no work from September 12, 2018 until she resigned in February 2019, Dkt. 34-1 at 20–21 (SUMF Resp. ¶ 80), and the authorization that she received to work at home during a short portion of that period did not constitute permission to stop work altogether for five months.

Before the proposed removal could take effect, Bajaj resigned.  On February 25, 2019, she sent an email to Portanova with the subject line "Last Day."  Dkt. 30-17 at 5.  She informed him that she was "resigning from [her] job at HUD," that her "last day w[ould] be March 2, 2019," and that she would "not be returning to the office at all."  *Id.*

## B.    Procedural Background

On August 8, 2018, Bajaj first contacted an Equal Employment Opportunity ("EEO") counselor in HUD's Office of Departmental Equal Employment Opportunity ("HUD's EEO Office").  *See* Dkt. 8-2 at 4 (Drew Decl. Ex. 1).  The EEO counselor issued a report on September 7, 2018, *id.*; *see also* 29 C.F.R. § 1614.105, and on September 18, 2018, Bajaj filed

two formal complaints with HUD's EEO Office, one "alleging discrimination based on her sex (female), race (Asian), national origin (India), disability, and age (over 40)," Dkt. 1 at 6 (Compl. ¶ 23), and the other alleging retaliation, Dkt. 8-2 at 17–20 (Drew Decl. Ex. 2 at 4–7). HUD's EEO Office investigated Bajaj's allegations and filed an investigator's report on May 7, 2019. Dkt. 1 at 6 (Compl. ¶ 24). On September 18, 2020, HUD moved for summary judgment in the administrative proceeding, and HUD's EEO Office granted that motion on January 28, 2021. *Id.* (Compl. ¶¶ 25–27). The final agency decision issued on March 23, 2021. *Id.* (Compl. ¶ 28).

On April 27, 2021, Bajaj filed suit in this Court. Dkt. 1. Her seven-count complaint alleged claims for discrimination based on race, sex, and national origin under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, (Count 1); discrimination based on age under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, (Count 2); discrimination based on disability under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, (Count 3); hostile work environment (Count 4), retaliation (Count 5), and constructive discharge (Count 6) under Title VII; and discrimination based on race, sex, national origin, and disability under the Civil Rights Act of 1991, 42 U.S.C. §§ 1981 and 1981a (Count VII). *Id.* at 7–17 (Compl. ¶¶ 30–86). Plaintiff seeks both injunctive and monetary relief, including compensatory damages and punitive damages. *Id.* at 8, 9, 10–11, 12, 14, 15, 17 (Compl. ¶¶ 36, 42, 51, 61, 69, 79, 86).

On July 23, 2021, Defendants filed a partial motion to dismiss. Dkt. 8. In response, Bajaj conceded that her claims under 42 U.S.C. §§ 1981 and 1981a should be dismissed, as should her claims against HUD itself (rather than against the Secretary) and her claims for punitive damages. Dkt. 9-1 at 11–12. With those concessions, the Court considered the only remaining argument raised in Defendants' motion: whether Counts 1, 2, and 5 should be

dismissed as time barred to the extent those claims were "based on actions that occurred more

than 45 days before . . . [Bajaj's] initial contact with the EEO Office." Dkt. 8-1 at 10–12; *see*

*also* Dkt. 11 at 1. This Court concluded that Bajaj's allegations predicated on discrete acts that

occurred before June 24, 2018 were time-barred. *Bajaj v. U.S. Dep't of Hous. and Urb. Dev.*,

No. 21-cv-1149, 2022 WL 612598, at *6 (D.D.C. Mar. 2, 2022). But her allegations involving

discrete acts that occurred after June 24, 2018, and her allegations regarding her May 2018

performance appraisal, survived the motion to dismiss. *Id.* With respect to the performance

appraisal, the Court merely concluded that it lacked sufficient information "at th[at] early stage"

of the proceeding to determine whether the performance appraisal affected the terms and

conditions of employment in some concrete manner within the 45-day window or whether it was

"inextricably linked" to another event, which did so. *Id.* at *5.

    After the parties conducted discovery, Defendants filed the pending motion for summary

judgment. Dkt. 30. Bajaj opposed, Dkt. 32, and Defendant replied, Dkt. 34.

## II.  LEGAL STANDARD

    To prevail on a motion for summary judgment, the moving party bears the burden of

demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of

affecting the outcome of the litigation. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007). In considering a motion for summary judgment, the Court

must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving

party.  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Holcomb*, 433 F.3d at 895).  "That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor." *Gentry v. McDonough*, 588 F. Supp. 3d 91, 95 (D.D.C. 2022) (citing *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987)).

The non-moving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "[T]he moving party is entitled to judgment as a matter of law if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (quoting *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020)) (alternation in original).  If the non-moving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

## III. ANALYSIS

Bajaj raises a host of discrimination, retaliation, and failure to accommodate claims under Title VII, the ADEA, and the Rehabilitation Act. Although her complaint is far from a picture of clarity, she touches on the following events: (1) her "unsuccessful" rating on one critical element on her 2018 Mid-Year Performance Review; (2) HUD alleged failure to train and to provide her with necessary mentorship for the FEMA project; (3) her July 31, 2018 opportunity to improve notice; (4) the suspension of her teleworking privileges on July 31, 2018; (5) HUD's failure to pay her wages from August 5 to 18, 2018; (6) HUD's alleged denial of her request for a reasonable accommodation in late September 2018; (7) her September 27, 2018 opportunity to improve notice; (8) placing her on absent without leave status; (9) denying her the use of her "Time-Off Award" on October 12, 2018; (10) her "unsuccessful" 2018 Annual Performance Review; (11) denying her pay during the government furlough in late 2018 and early 2019; and (12) denying her request for advanced sick leave, after she had used all of her leave.

As the record reflects, Bajaj's experience working at HUD was—by any measure— tension-filled and unhappy. But not every such experience is the product of discrimination, retaliation, or a failure reasonably to accommodate an employee's disability. For a variety of reasons, none of Bajaj's many claims raise a triable issue of fact under Title VII, the ADEA, or the Rehabilitation Act.

### A.    2018 Mid-Year Performance Review

Bajaj first alleges that she received an "unsuccessful" rating on the collaboration element of her 2018 Mid-Year Performance Review based on discriminatory and retaliatory animus. Defendants previously moved to dismiss the claim on the ground that Bajaj did not raise the issue with an EEO counselor in a timely manner, and the Court declined to reach the merits of

that argument on the bare pleadings.  Dkt. 13 at 11.  Defendants now review the argument, and this time they are entitled to prevail.

As Bajaj acknowledges, a plaintiff seeking to recover from a federal agency for alleged violations of Title VII, the ADEA, and the Rehabilitation Act, must exhaust her administrative remedies before bringing suit.  *See Coleman v. Duke*, 867 F.3d 204, 206 (D.C. Cir. 2017) (administrative exhaustion required under Title VII and the ADEA); *Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015) (same for Rehabilitation Act).  "Regulations prescribe in detail the administrative procedures available" to federal employees, and federal law "hinges court review on prior resort to the agency whose employment practice is challenged."  *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983) (footnote omitted) (discussing Title VII).  "The exhaustion requirements for these statutes overlap in significant ways but are not entirely coextensive." *Bain v. Office of the Attorney General*, 648 F. Supp. 3d 19, 44 (D.D.C. 2022).

Under the relevant governing regulation, employees of a federal agency who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information . . . must initiate contact" with the agency's EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1); *see also Green v. Brennan*, 578 U.S. 547, 549 (2016).  Discrimination claims arising out of a discrete discriminatory act that are not brought to the attention of an agency's EEO counselor within 45 days of the alleged conduct are deemed barred by the regulatory scheme.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."); *see also*

*Vickers v. Powell*, 493 F.3d 186, 198 (D.C. Cir. 2007).  That is because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  *Morgan*, 536 U.S. at 113.  Hostile work environment claims are subject to different rules, which are not at issue here.

If the employee and the EEO counselor cannot resolve the claim within 30 days, the counselor must notify the employee of her right to file a formal administrative complaint, and the employee may then do so within 15 days.  *See* 29 C.F.R. § 1614.105(d); *id.* § 1614.106(b).  If the employer does not act on that formal administrative complaint within 180 days, or if it denies relief, the employee may then file suit in federal court.  *Id.* § 1614.407(b).

The exhaustion rules differ slightly under the ADEA.  *See Achagzai v. Bd. of Governors*, 170 F. Supp. 3d 164, 172 (D.D.C. 2016).  In addition to the process described above, the ADEA permits a federal employee to "bring [her] claim directly to federal court so long as, within 180 days of the allegedly discriminatory act, [the employee] provides the EEOC with notice of [her] intent to sue at least 30 days before commencing suit."  *Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003) (citing 29 C.F.R. §§ 633a(c), (d)). "An employee who elects this path need not file an administrative complaint."  *Achagzai*, 170 F. Supp. at 172.

Here, Bajaj does not rely on this alternative and, instead, maintains that she exhausted her administrative remedies by timely notifying HUD's EEO counselor and then filing a timely administrative complaint, which the agency rejected.  Defendants' motion, moreover, focuses exclusively on the first step in the process—that is, did Bajaj timely contact an EEO counselor regarding her allegation that her May 21, 2018 Mid-Year Performance Review was based on discriminatory and retaliatory animus?  As the undisputed record now reflects, the answer to that question is "no".

To start, it is undisputed that Bajaj first contacted HUD's EEO counselor on August 8, 2018 and that, accordingly, the 45-day limitations period covers acts occurring on or after June 24, 2018. Dkt. 34-1 at 16 (SUMF Resp. ¶ 61). The Court previously granted Defendants' motion to dismiss Bajaj's claims premised on discrete acts that occurred before June 24, 2018, with the exception of her claims relating to her 2018 Mid-Year Performance Review. Dkt. 13 at 11. As the Court explained, it was unclear at the pleading stage whether Bajaj's subsequent OIN was "inextricably linked to" the unsuccessful performance rating contained in the review and whether the adverse consequences of that rating only took form with issuance of the OIN. *Id.* In other words, it was unclear—at that early stage of the proceeding, when the Court was required to construe the complaint in the light most favorable to Bajaj—whether the Mid-Year Performance Review and the OIN were discrete events or were simply wo parts of a single employment action.

Now at summary judgment, the Court concludes that no reasonable trier of fact could conclude that the Mid-Year Performance Review and the OIN were inextricable parts of single, two-step personnel action. As Defendants observe, the issuance of a performance plan is discretionary and does not follow, as a matter of course, for a single unsuccessful rating on a mid-year review. *See* Dkt. 30-64 at 26 ("An opportunity to improve notice may be given to an employee at any time during the appraisal period when his/her performance becomes Level 1"). Here, moreover, Bajaj's Mid-Year Performance Review was issued on May 21, 2018, Dkt. 30-24 at 22, and yet her first OIN was not issued until July 31, 2018, Dkt. 30-35; Dkt. 34-1 at 12 (SUMF Resp. ¶ 45), almost six weeks later. At first, Bajaj seemed to be "on the right track," and, "in fact, she seems to have made quite a bit of progress." Dkt. 30-27. It was only after she was moved to the FEMA project, and faced a new set of hurdles there, that her progress seemed

to regress.  *See* Dkt. 34-1 at 7–9 (SUMF Resp. ¶¶ 28–34); Dkt. 30-23; Dkt. 30-24; Dkt. 30-25;

Dkt. 30-26; Dkt. 30-3 at 29–30 (Evans Dep. 29:10–30:15).

In short, there is no evidence that would permit a reasonable trier of fact to conclude that

the Mid-Year Performance Review and the OIN were "part of a single, two-step hiring process."

*Shelly v. Geren*, 666 F.3d 599, 605 (9th Cir. 2012).  The Court, according, concludes that Bajaj

failed to timely exhaust her claim that her Mid-Year Performance Review was discriminatory or

retaliatory.

The Court pauses, moreover, briefly to note that the claim would, in any event, fail as a

matter of law.  Under the relevant burden-shifting framework, once a plaintiff establishes a prima

facie case of discrimination or retaliation "the burden then shifts to the employer to articulate a

legitimate, nondiscriminatory reason for its action."  *Wheeler v. Georgetown Univ. Hosp.*, 812

F.3d 1109, 1114 (D.C. Cir. 2016).  But "once the employer asserts a legitimate, non-

discriminatory reason, the question whether the employee actually made out a prima facie case is

'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'"  *Brady v. Office of*

*the Sergeant of Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) (citations omitted).  At that point,

the Court "must resolve one central question: Has the employee produced sufficient evidence for

a reasonable jury to find that the employer's asserted non-discriminatory reason was not the

actual reason and that the employer intentionally discriminated against the employee on the basis

of race, color, religion, sex, [retaliation], or national origin?"  *Id.* at 494.

Applying that test here, the Court concludes that no reasonable jury could find that

Defendants' proffered reason for giving Bajaj an "unsuccessful" rating on the collaboration

element was pretextual and that the "actual reason" for that rating was a product of

discriminatory or retaliatory animus.  To the contrary, the record is replete with evidence that

Bajaj was unable to work with her colleagues, so much so that she asserted that she felt as though she was in physical danger, Dkt. 30-17 at 1; 30-20 at 11–13, and begged to be moved to a different team, Dkt. 30-20 at 13.  It is not this Court's role to step into the shoes of Bajaj's supervisors and to decide for itself whether Dennis spent too much time in proximity to Bajaj or whether Krapf inappropriately raised his voice or made a vulgar gesture with his hands.  The sole question is whether there is any basis to doubt that Bajaj's supervisors actually believed that Bajaj lacked the necessary skills to collaborate with others and to find, instead, that this asserted concern was pretextual?  Even a cursory reading of the undisputed record answers that question and forecloses Bajaj's challenge to her Mid-Year Performance Evaluation—and much of the remainder of her claims.

The Court will, accordingly, grant summary judgment in Defendants' favor with respect to the Mid-Year Performance Review.

## B.    Retaliation Claims

Title VII, the ADEA, and the Rehabilitation Act prohibit a federal employer from "discriminat[ing] against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice" under the relevant statute.  42 U.S.C. §§ 2000e–3(a), 2000e–16 (Title VII); *Gomez–Perez v. Potter*, 553 U.S. 474, 479 (2008) (ADEA); *see also Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009) ("Title VII and the ADEA protect employees who engage in . . . protected activity."); 42 U.S.C. § 12203(a), as extended to Rehabilitation Act, 29 U.S.C. § 791(g); *Solomon v. Vilsack*, 763 F.3d 1 (D.C. Cir. 2014) (Rehabilitation Act).  "To prove unlawful retaliation, a plaintiff must show: (1) that [s]he opposed a practice made unlawful by Title VII[,] [the ADEA, or the Rehabilitation Act]; (2) that the employer took a materially adverse action against h[er]; and (3) that the employer took the action 'because' the employee

opposed the practice." *Harris v. District of Columbia*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)) (applying the test in a Title VII case); *see also Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331 (D.C. Cir. 1991) (applying the test in an ADEA case); *Solomon*, 763 F.3d at 14 (applying test in a Rehabilitation Act case).

As noted, "[t]o recover under the opposition clause, the plaintiff must have been discriminated against for opposing a practice 'made an unlawful employment practice by [Title VII].'" *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)). This threshold requirement is ordinarily met when "an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty*, 555 U.S. 271, 276 (2009) (internal quotation marks and citation omitted). Not all "opposition" is protected by Title VII, however. To be sure, informal complaints—such as emails to management, rather than a formal complaint with an EEO counselor—may constitute protected activity. But "[n]ot every complaint garners its author protection." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition," *id.*, and it must be based on a reasonable, good faith belief that the practice at issue "was unlawful under the statute," *McGrath*, 666 F.3d at 1380.

Here, Defendants posit that most of Bajaj's retaliation claims fail because she did not engage in any protected activity prior to August 8, 2018, by which point Bajaj had stopped reporting to work in person, despite the fact that her OIN precluded her from teleworking. In response, Bajaj identifies only a single, prior communication, which she characterizes as

protected, oppositional activity.[4]  *See* Dkt. 32 at 21.  Recall that early on in Bajaj's tenure at HUD she came to believe that Dennis was "stalking" her and that Krapf was bullying her.  She repeatedly complained about this treatment and requested a transfer to a different team.  Then, on March 12, 2018, Bajaj sent Evans an email, which is quoted in full above.  The email is captioned "Wanted to let you know . . . how your behavior makes me feel," and it focuses exclusively on Bajaj's ongoing difficulties with her team members and Evans failure to "fix the problem."  Dkt. 30-17 at 1.  Bajaj complains that, although she had "tried to talk" to Evans "many times," "every time [Evans] had some excuse and [they] never talked."  *Id.*  She complains that although Evans removed two individuals (presumably from the team), "that didn't fix the problem and you thought it [would] go away."  *Id.*  She complains that Evans did not ask her if she accused Krapf of being "unprofessional;" that Evans "almost scream[ed] at [her] in [an] email" and then copied Krapf on the email; and that Evans "started insulting/bullying/torturing [her] in front of [Krapf]," thereby "encourag[ing] such bullies behavior."  *Id.*  She accuses Evans of creating "a very stressful, irksome and unpleasant environment," which "is very unhealth healthy."  *Id.*

   After all of this, Bajaj concludes her email with the following passage:

   You have become a horror for me.  Your name also frightens me.  You are my Boss[,] and I should be comfortable talking to you[.]  But your thought is also daunting.  *You discriminate me* all the time.  You are being *hostile* towards me for no reason.

   I had to take it out so that you know how your behavior makes me feel.

---

[4]  Although Bajaj does not press the point in her opposition brief, the Court notes that she also referred—in general terms—to discrimination at HUD in her August 2, 2018 email, see Dkt. 30-36.  But even if Bajaj had argued that this email constituted protected, oppositional activity under Title VII, the ADEA, or the Rehabilitation Act, the difference between August 2 and August 8 would be immaterial for present purposes.

*Id.* (emphasis added).  In her view, the inclusion of the words "discriminate" and "hostile" in this lengthy email constituted protected activity, and a reasonable jury could find that all or some of the adverse employment actions that she subsequently encountered were taken in retaliation for these accusations.  The Court is unpersuaded for several reasons.

First and foremost, Bajaj does not object to any practice made unlawful under Title VII, the ADEA, or the Rehabilitation Act.  Her email includes no mention of her sex, national origin, religion, age, or disability, nor does she suggest that Evans was "discriminat[ing] against [her]" or was "being hostile towards [her]" based on any protected status.  Instead, the email reflects Bajaj's general frustration with her workplace, her belief that she was being bullied, and her annoyance that Evans had failed to credit, or to take sufficient action with respect to, her complaints about Krapf and Dennis.  She fails to identify any "practice" that Evans allegedly engaged in that was "made unlawful" under Title VII, the ADEA, or the Rehabilitation Act.  *See Peters v. District of Columbia*, 873 F. Supp. 158, 204–05 (D.D.C. 2012) (plaintiff did not sufficiently demonstrate protected activity where she "complained to human resources" that her supervisor had abused her and screamed at her); *Broderick*, 437 F.3d 1232 (written complaint to supervisors not protected activity because the plaintiff complained of mistreatment but made no allegations that she was being discriminated against or retaliated against); *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 247 (D.D.C. 2011) (granting summary judgment to the defendant on retaliation claim because the plaintiff "put forward no evidence that his complaint to [] management alleged unlawful discrimination based on his membership in a protected class"); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 92 (D.D.C. 2006) (holding that the plaintiff had not demonstrated that she participated in a protected activity where she complained of harassment by her supervisor but the "complaint allege[d] harassment generally

36

and generically . . . and [does] not refer to harassment [or discrimination] based on race or any

other protected category") (internal quotation marks omitted) (alteration in original).

To be sure, an employee need not cite to a particular statute or set forth a detailed

complaint to satisfy the first element of a retaliation claim, and each retaliation claim must be

evaluated based on the particular context and circumstances. Mere use of the word

"discriminate" might suffice in some circumstances. If a male employee objected to a leave

policy that applied only to new mothers, for example, it might be enough simply to assert that the

policy "discriminates." *Cf. Savignac v. Day*, 754 F. Supp. 135, 174–177 (D.D.C. 2024). But,

here, nothing in the email identifies the allegedly discriminatory practice, nor does it identify the

allegedly discriminatory classification or status. To the contrary, read in context and without any

reference to any protected classification or status, the email seems merely to complain that Evans

has *favored* Krapf, Dennis, and others over Bajaj, believing what they say as opposed to

crediting Bajaj's version of events. But regardless of what Bajaj may—or may not—have meant,

her email fails to identify a practice made unlawful by Title VII, the ADEA, or the Rehabilitation

Act and, instead, focuses on office politics unconnected to any protected classification.

Finally, and for related reasons, Bajaj has failed to offer evidence that would permit a

reasonable jury to find that Evans took any adverse action against her because she used the word

"discriminate" in her email. She otherwise accuses him of creating a "stressful, irksome and

unpleasant environment" and damaging her health, of inappropriately responding to her

complaints about Krapf in an email that copied Krapf, of becoming "a horror for" her and

"frighten[ing]" her, of "almost screaming at" her "in [his] email;" and of failing to fix the

problem that he had promised to fix. Dkt 30-17 at 1. Although temporal proximity can, at times,

support an inference of causation, *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74

(2001), in the present context there is no evidence that would permit a reasonable jury to find that Evans took any adverse action against Bajaj because she included the word "discriminate" in her more sweeping verbal attack on him.

The Court, accordingly, concludes that all of Bajaj's pre-August 8, 2018 retaliation claims fail as a matter of law.

## C.    Failure to Train or to Provide Mentorship for FEMA Assignment

Bajaj alleges that Defendants discriminated and retaliated against her by "assign[ing] her to tasks for which she was not trained" and by "refus[ing] to offer requested training or mentorship." Dkt. 1 at 3 (Compl. ¶ 33); *see also id.* at 7–8, 10–11, 13 (Compl. ¶¶ 9, 40, 50, 56, 64). In particular, she contends that although she lacked the JAVA skills and SOAP web service skills necessary to succeed on the FEMA project, Dkt. 32 at 26, she was placed on the project, and, even after she requested help, no one provided her with the necessary training, Dkt. 34-1 at 8 (SUMF Resp. ¶ 33). At her deposition, Bajaj further explained her position:

> . . . . Your goal is to get rid of me.
>
> That is why you put me on this project. You know I don't have the skill[s]. Out of 30 to 34 employees in your office, I think more than 25, 30 have Java skill[s][,] but I don't have. And you put me on that project which need[ed] JAVA skills. Why would you do that? Because your goal is not that I become successful.
>
> Your goal is so that you can prove I'm incompetent and you can get rid of me. [Evans] did these types of things multiple times.

Dkt. 30-2 at 58–59 (Bajaj Dep. 58:22–59:6).

This argument, however, suffers from two insurmountable problems. First, the uncontroverted record shows that Bajaj did, in fact, receive extensive training. She "received over 151 hours of training from lynda.com, an online training portal," and had "taken at least 14 training courses in JAVA." Dkt. 34-1 at 11–12 (SUMF Resp. ¶¶ 41–42). Moreover, Bajaj

herself represented in her 2018 Mid-Year Performance Review that she had taken JAVA courses over the "last year," that she had "created a couple of projects in J[AVA] on [her] own," and that she was "[n]ow . . . ready to work in J[AVA] when the right opportunity knocks at [her] door." Dkt. 8-2 at 37-38; *see also* Dkt. 34-1 at 12 (SUMF Resp. ¶ 43). And although Bajaj maintains that Evans' promise to arrange for "the FEMA developer [who] created" the SOAP web service to assist her, Dkt. 30-32 at 2, never came to fruition, she acknowledged that she "spoke with the project manager," but he "was not an IT guy," Dkt. 30-2 at 101 (Bajaj Dep. 101:3–19).

Bajaj argues that a genuine issue of material fact nonetheless exists because, although she "did receive come online training, it was not practical training and instead she was provided only theoretical knowledge," which did "not help with [her] JAVA skills," and because Evans "never arranged for a meeting between [her] and a FEMA developer" to help her with the SOAP web service. Dkt. 32 at 27. But Bajaj herself represented during her 2018 Mid-Year Performance Review that she had successfully completed a couple of JAVA projects and was "ready to work in J[AVA]," and she fails to proffer any evidence suggesting that Evans should have known that this was unsupported puffery or that she merely possessed "theoretical" skills that did not translate into "practical" application. Moreover, she simultaneously complains that Evans did not arrange for her to meet with the FEMA developers, while asserting that the developers no longer work for HUD, Dkt. 30-2 at 100–101 (Bajaj Dep. 100:24–101:2). Finally, Bajaj responded to Evans' email offering help by telling him that she did not "have the time to learn and [to] perform at the same time." Dkt. 30-31 at 1. As a result, the undisputed record would not permit a reasonable jury to find that Defendants discriminated or retaliated against Bajaj by denying her access to necessary training.

Second, there is no evidence in the record that would permit a reasonable jury to find that Evans refused to provide her with the necessary training—and set her up to fail—based on any discriminatory or retaliatory animus.  There is no evidence, for example, that Evans assigned Bajaj to the FEMA project as part of a twisted scheme to end her career at HUD.  To the contrary, he moved her to the FEMA project because she repeatedly pleaded with him to take her off her prior team and to reassign her.  Dkt. 30-20 at 13.  And if his goal was to see her fail, he could have simply left her on her original team, where her performance was already "unsuccessful" on one of the critical performance elements.

Because Defendants have offered legitimate, non-discriminatory reasons for their actions—including Bajaj's representation that she had JAVA skills and Bajaj's own repeated requests for a reassignment—Bajaj bears the burden of proffering evidence that would permit a reasonable jury to find that these reasons were pretextual and that Defendants' actual reasons were retaliatory or discriminatory.  *See Brady*, 520 F.3d at 493–94.  She has failed to do so.  To start, as explained above, Bajaj did not engage in any protected activity until August 8, 2018— weeks after the relevant events—foreclosing any claim of retaliation during the relevant period.  Moreover, even if the Court were to conclude that her earlier email constituted a protected activity, she offers no evidence that Evans transferred her or failed to provide her with any additional training because of anything that she said in that email.  Nor has she proffered any evidence that might support a reasonable inference of discriminatory motive.

In this latter respect, she points to (1) her supervisors alleged criticism of her English usage and grammar, Dkt. 32-2 at 1, 4–5 (Admin. Compl. ¶¶ 8, 10, 27), and (2) her deposition testimony that Evans twice told her that white guys are better than white women, who are better than black guys, who are better than women of color, Dkt. 30-2 at 119–120 (Bajaj Dep. 119:22–

120:8); *see also id.* at 121 (Bajaj Dep. 121:7–18); *but see* Dkt. 30-3 at 54–56 (Evans Dep. 54:9–56:19).  Related to the second of these points, she also contends that Evans told her: "when I came from British[,] I did not want to take any orders from woman."  Dkt. 30-2 at 119–120 (Bajaj Dep. 119:22–120:3).

Neither set of arguments, however, is sufficient to establish pretext.  The first of Bajaj's contentions offers little help, because the communications included in the record confirm that Bajaj's usage and grammar were, in fact, often incorrect, making it difficult at times "to understand what [she] was saying," Dkt. 32-3 at 1 (Admin. Compl. ¶ 9).  The second contention, although more troubling, is also unavailing.  As this Court has repeatedly observed, "[e]ven if the Court assumes that [a] [p]laintiff's claims of racial epithets are true for summary judgment purposes," the plaintiff must still establish a "nexus between the stray remark and the adverse employment decision."  *Ajiisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 44–45 (D.D.C. 2014) (collecting cases) (internal quotations omitted).  Here, however, Bajaj cannot recall when the remarks were made—foreclosing any inference based on temporal proximity, *see Lucas v. Paige*, 435 F. Supp. 2d 165, 170–71 (D.D.C. 2006)—and has failed to offer any other evidence that could support the required nexus.  To the contrary, even accepting the truth of Bajaj's account (which Evans vehemently denies), it does not—without more—support a reasonable inference that Evans transferred Bajaj (after she begged for a transfer) to the FEMA project and failed to provide her with training (which she claimed that she already had during her Mid-Year Performance Review) based on her race, nationality, or sex.

The Court, accordingly, concludes that Defendants are entitled to summary judgment on Bajaj's failure to train or to provide mentorship claim.

**D.    Opportunity to Improve Notices and 2018 Annual Performance Review**

Bajaj also alleges that she was subjected to the July 31, 2018 and September 27, 2018 Opportunity to Improve Notices and received an "unsuccessful" rating on each of the critical elements on her 2018 Annual Performance Review due to discriminatory and retaliatory animus.

The Court has already rejected Bajaj's retaliation claim with respect to the July 31, 2018 OIN on the ground that the OIN preceded Bajaj's protected activity, which did not occur until August 8, 2018. But, in any event, both that claim and her discrimination challenge to the July 31, 2018 OIN fail because Defendants have offered a legitimate, nondiscriminatory reason for that action, and Bajaj has failed to carry her burden of showing that the proffered rationale is pretextual and that the actual reason was discriminatory. *See Brady*, 520 F.3d at 493–94. As explained above, the record is replete with evidence that Bajaj was having difficulty collaborating with her colleagues and that her supervisors believed she lacked the necessary skills to collaborate with others. *See, e.g.*, Dkt. 30-17 at 1; Dkt. 30-2 at 29 (Bajaj Dep. 29:1–5). The Court need not—and should not—moreover, "second-guess" her supervisors' determination of who was at fault "absent [a] demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982); *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Yet, Bajaj offers no evidence—beyond what the Court has already discussed and rejected—that would permit a reasonable jury to find that the rationale set forth in the OIN was pretextual and that Evans' actual motivation for issuing the OIN was discriminatory.

The same logic applies to the September 27, 2018 OIN and the 2018 Annual Performance Evaluation. Like her July 31, 2018 OIN, her September 27, 2018 OIN explained that her performance on the critical element of collaboration remained at the unacceptable level. Dkt. 30-48. As explained above, Bajaj concedes that, after receiving her first OIN, she simply stopped

reporting to work in person because she was "fearful of [her] life."  Dkt. 34-1 at 13 (SUMF Resp. ¶ 48); Dkt. 30-2 at 55 (Bajaj Dep. 55:11–16).  It is, thus, unsurprising that over the intervening two months, she failed to demonstrate any improvement in her performance on this critical element.  In essence, the second OIN merely continued the prior OIN given this lack of tangible progress, and, if anything, it represented an opportunity for Bajaj to address the stated concerns, rather than face the more draconian actions that the prior OIN foreshadowed.  It follows that, for the same reasons that no reasonable jury could find that the first OIN was pretextual and that it was, in fact, issued for discriminatory or retaliatory reasons, no reasonable jury could find in Bajaj's favor with respect to the second OIN.

Bajaj's position with respect to her 2018 Performance Review is even less tenable.  The review rated Bajaj's performance as "unsuccessful" on each of the five critical elements for a singular reason:  Bajaj "[w]ould not participate in an OIP, cut off communications with [her] supervisor and 2nd level supervisor, [and] went AWOL."  Dkt. 30-55 at 5, 7–9, 11.  Bajaj fails to offer any evidence controverting this assessment and, to the contrary, admits that she was absent without leave from September 12, 2018 until she resigned in February 2019.  Dkt. 34-1 at 20–21 (SUMF Resp. ¶ 80).  Under those circumstances, no reasonable jury could find that the Performance Review, which merely reported her disengagement and, unsurprisingly, concluded that she had failed to meet minimal performance standards, was pretextual, discriminatory, or retaliatory.

The Court, accordingly, concludes that Defendants are entitled to summary judgment on Bajaj's OIN and 2018 Performance Review claims.

### E.    Remaining Allegedly Adverse Actions

Bajaj's remaining retaliation and discrimination claims fail for similar reasons:

*First*, Bajaj alleges that her right to telework was suspended on July 31, 2018 for retaliatory or discriminatory reasons.  Because this action occurred before August 8, 2018, when Bajaj first conferred with an EEO counselor, her retaliation claim fails for the reasons discussed above; she cannot bring a retaliation claim challenging an event that occurred before she engaged in any protected activity.  But, even putting that threshold difficulty aside, no reasonable jury could decide in her favor based on either a theory of retaliation or discrimination.

Defendants have, once again, proffered a legitimate, nondiscriminatory reason for the challenged action.  This time, they point to an established policy forbidding employees who have received an opportunity to improve notice from teleworking.  The HUD Teleworking Policy provides as follows: "Employees working under an OIP, PIP or on [a] leave restriction are **ineligible** to participate in this program."  Dkt. 30-65 at 7 (emphasis in original).  And Bajaj has, once again, failed to offer evidence that would permit a reasonable jury to find that this policy was mere pretext for discrimination.  The policy was adopted in 2010, years before Bajaj started work at HUD, and it is categorical, leaving no room (short of a Rehabilitation Act accommodation, discussed below) for the exercise of discretion.  Bajaj offers no evidence that her supervisors invoked this settled policy for discriminatory (or retaliatory) reasons.

*Second*, Bajaj alleges that she was discriminated and retaliated against when she was forced to take leave without pay and, as a result, denied pay from August 5 to August 18, 2018, when she was prevented from using her Time Off award, and when she was denied furlough status.  Dkt. 1 at 7 (Compl. ¶ 30).  The uncontroverted evidence, however, belies this allegation.  To start, Bajaj was not simply denied pay from August 5 to August 18.  Dkt. 34-1 at 32–33 (SUMF Resp. ¶ 35); Dkt. 30-34; Dkt. 30-40.  Rather, the contemporaneous evidence shows that Evans offered Bajaj the choice to use annual leave, a time off award, or leave without pay when

she indicated that she no longer wanted to come into work after receiving the July 31 notice. *See* Dkt. 30-40 at 1 (Because Bajaj "did not have any remaining sick leave (actually negative) I offered her the choice of using vacation, a time off award from 2017, and/or leave without pay. She elected not to use her vacation or time off award."). Evans emailed Bajaj with those options, and Bajaj responded: "I would like to go [on] negative leave rather than using any of those options." Dkt. 30-34 at 1. Based on this evidence—and in the absence of evidence that any similarly situated employee, who was not a member of the relevant protected class or who had not engaged in protected activity, was permitted to continue to accrue "negative" sick leave under similar circumstances—no reasonable jury could find that limiting Bajaj to the three options set forth in Evans' email was discriminatory or retaliatory.

The uncontroverted record also shows that Bajaj did not request to use her Time Off award on October 12, 2018. Specifically, the Collective Bargaining Agreement provided that "[e]mployees shall use the Department's automated time and attendance system ["WebTA system], or any successor system to request all leave." Dkt. 30-66 at 2. The WebTA log, however, shows that Bajaj did not request leave at that time. *See* Dkt. 30-62 at 2. In response, she argues that this "timecard" response is pretextual and that she "was informed by her Union that [Evans] contacted HUD Human Resources and had the timecard changed." Dkt. 32 at 40. That contention, however, relies exclusively on double, or perhaps triple or quadruple, hearsay. She points to her own statement in the EEO investigation, which asserts that Bajaj was "told by [the] Union that Mr. Evans called HR and got the time card changed." Dkt. 32-1 at 15 (Bajaj Aff. ¶ 32). She does not indicate (or perhaps even know) who Evans allegedly spoke to in HR, or who in HR told anyone at the union that this occurred. An affidavit or declaration offered at summary judgment "must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Here, Bajaj could have sought to depose the union representative or someone from HR to learn more and might, perhaps, have discovered admissible evidence. She did not do so. And her statement to the EEO investigator was not based on personal knowledge and would not, if offered at trial, be admissible. This argument, accordingly, also fails.

Nor has Bajaj offered evidence that would permit a reasonable jury to find that HUD declined to pay her for the two-week period that all government employees were placed on furlough status between December 23, 2018 and January 5, 2019, for discriminatory or retaliatory reasons. As Defendants explain—without contradiction—established policy provided that, during a Lapse in Appropriations, "Employees who were on previously approved leave without pay (LWOP) or who were absent without leave (AWOL) during the lapse in appropriations will not receive pay for those hours." *See* Dkt. 30-63 at 1 (Lapse in Appropriations Fact Sheet). Although Bajaj maintains that she "was placed on furlough status for the pay period" and thus, like other government employees, was entitled to retroactive pay, Dkt. 34-1 at 34 (SUMF Resp. ¶ 36), she does not dispute that she was on AWOL status during the relevant period, Dkt. 30-62 at 1–5, and, indeed, concedes that she did not go into the office at all after July 30, 2018, Dkt. 30-2 at 107 (Bajaj Dep. 107:10–13), and performed no work after September 12, 2018, Dkt. 30-1 at 20-21 (SUMF Resp. ¶ 80).

*Third*, although it is unclear whether Bajaj contends that Defendants violated Title VII or the ADEA by denying her request for leave under the Family Medical Leave Act ("FMLA")— or, instead, merely alleges a violation of the Rehabilitation Act, which the Court discusses below—any such claim would fail in any event. To start, the Court notes that Bajaj does not

defend this claim in her brief in opposition to Defendant's motion for summary judgment, *see*

Dkt. 32, and she has, thus, conceded the issue.  But in any event, the claim fails as a matter of

law.  The undisputed record shows that, at Bajaj's request, Evans filled in the requested

information on the FMLA form.  Dkt. 34-1 at 19 (SUMF Resp. ¶ 72).  And the undisputed record

shows that "Evans did not have the authority to approve or disapprove [the] FMLA" application.

*Id.* at 18 (SUMF Resp. ¶ 71).  Although the parties disagree about whether Bajaj ever submitted

the completed application, *see id*. at 19 (SUMF Resp. ¶ 74), the request appears nowhere in

HUD's FMLA records, Dkt. 30-12 at 1, and Bajaj offers no evidence that would permit a

reasonable jury to find that HUD's contention that it never received a request from Bajaj was

pretextual and that the request was, in fact, denied for discriminatory or retaliatory reasons.

Indeed, even if one assumes that the request was received, Bajaj fails to identify anyone who had

authority to act upon her request who even arguably harbored any discriminatory or retaliatory

animus toward her.

      Given Bajaj's testimony and the timing of relevant events, it appears to the Court that

Bajaj has simply confused what she at times characterizes as a request for medical leave with

what her union representative and HUD (as well as Bajaj herself at other times) understood to be

a request for reasonable accommodation—that is, a request to telework for four weeks.  *See* Dkt.

30-46 at 2 (September 26 request for "reconsideration of . . . denial of a work at home reasonable

accommodation request); Dkt. 30-2 at 128 (Bajaj Dep. 128:7–10) ("I had applied under FMLA

like I could have applied for my reasonable accommodation and if my doctor can fill the forms,

whatever he was supposed to fill for FMLA why I needed these reasonable accommodations

there.").  As explained below, that request was granted and, thus, cannot provide the basis for a

discrimination or retaliation claim.  Dkt. 30-46 at 1.  But to the extent she intends to press a

separate claim for failure to grant her a medical leave, that claim finds no support in the undisputed record.

*Fourth*, Bajaj also alleges that Defendants' denial of her request to continue to accrue a "negative" sick leave balance was discriminatory and retaliatory.  Dkt. 1 at 3, 7, 8, 13 (Compl. ¶¶ 9, 33, 40, 64).  Although Defendants move for summary judgment on these claims, positing that Bajaj was not entitled to sick leave under either HUD policy or her union agreement, Bajaj—once again—says nothing about this issue in her opposition brief and has, thus, conceded the issue.  But any event, the claim fails because Defendants have proffered a legitimate, nondiscriminatory reason for declining her request, and Bajaj has failed to offer evidence that would permit a reasonable jury to find that HUD's stated rationale is pretextual and that the actual reason was discriminatory or retaliatory.  *See Brady*, 520 F.3d at 493–94.

As Defendants explain, established HUD policy provided that "[s]ick leave may not be advanced if . . . [c]hronic ailments have necessitated the employee's absences in the past[.]" Dkt. 30-61 at 17; *see also* Dkt. 34-1 at 15 (SUMF Resp. ¶ 55).  The policy further provided, moreover, that "[r]egardless of the circumstances, an employee" subject to the policy "does not have a right to an advance [of sick leave].  Dkt. 30-61 at 17; *see also* Dkt. 34-1 at 15 (SUMF Resp. ¶ 55).  Bajaj's union agreement included the same rule.  Dkt. 30-66 at 4; *see also* Dkt. 34-1 at 15 (SUMF Resp. ¶ 56).  As Evans explained during the EEO investigation, Bajaj's request for advanced sick leave was denied pursuant to these rules:

> The union contract states that an employee cannot be granted advanced sick leave for a recurring issue. [Bajaj] stated that her issue was 'recurring and had required absences in the past, and are expected to continue.' She was advised to apply for FMLA and I granted LWOP for the periods she submitted doctor's notes. The union rep worked with me to obtain the required information for FMLA from the supervisor, which I returned September 18, 2018.

Dkt. 30-10 at 47 (Evans Aff. ¶¶ 230–32).  There is no reason, moreover, to believe that Evans' explanation was pretextual.  To the contrary, Bajaj admits that she had a chronic ailment.  Dkt. 34-1 at 15 (SUMF Resp. ¶ 57).  As such, she was not qualified to receive advanced sick leave.

Finally, the Court notes that none of the critical and at times offensive comments that Bajaj attributes to Evans (which he denies having said), support an inference of pretext.  As discussed above, "[e]ven if the Court assumes that [a] [p]laintiff's claims of racial epithets are true for summary judgment purposes," the plaintiff must still establish a "nexus between the stray remark and the adverse employment decision," *Ajiisefinni*, 17 F. Supp. 3d at 44–45 (internal quotations omitted), which she has failed to do here.  *See also Pauling v. D.C.*, 286 F. Supp. 3d 179, 206 (D.D.C. 2017); *see also Tarquinii v. Del Toro*, No. 21-1567, 2024 WL 4298857, at *10 (D.D.C. Sept. 26, 2024) (sexually and religiously inappropriate remarks were not sufficient to support the plaintiff's pretext argument because the remarks were isolated and had no apparent connection to the allegedly discriminatory act); *Simms v. U.S. Gov't Printing Off.*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000) ("[E]ven [remarks] made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff."); *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 323 (D.D.C. 2018) (isolated remarks are not sufficient, "without more, [to] permit a jury to infer discrimination.").  Indeed, if anything, the allegedly discriminatory or retaliatory actions discussed above were even more temporally remote and disconnected from Evans' alleged statements than the events discussed above.[5]

---

[5] Without material evidentiary support, Bajaj asserts that she was "treated markedly worse than other employees" and that she is the "only North Indian employee."  Dkt. 32 at 26.  To the extent Bajaj is alleging that she was treated worse than other employees of Indian descent because she is North Indian, she offers no evidence to support such a claim, beyond her *ipse dixit* statement

The Court, accordingly, concludes that Defendants are entitled to summary judgment on Bajaj's remaining discrimination and retaliation claims.

## F.    Rehabilitation Act – Failure to Accommodate

Bajaj also claims that she was denied a reasonable accommodation, under the Rehabilitation Act, for her telework request.  Dkt. 1 at 9–11 (Compl. ¶¶ 43–51).  To prevail on a failure to accommodate claim, a plaintiff must establish that "(1) [s]he had a disability within the meaning of the [Rehabilitation Act]; (2) h[er] employer had notice of h[er] disability; (3) [s]he could perform the essential functions of the position with reasonable accommodation; and (4) h[er] employer refused to make such accommodation." *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 153–54 (D.D.C. 2013) (citing *Gordon v. District of Columbia*, 480 F. Supp. 2d 112, 115 (D.D.C. 2007)).  "If the plaintiff establishes a prima facie case of failure to provide reasonable accommodation, then it is up to the employer to demonstrate that the accommodation would have imposed an undue burden on its business; the ultimate burden, however, remains with the plaintiff." *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 77 (D.D.C. 2012).

Here, the Court's analysis can begin and end with the final element.  The undisputed evidence shows that Bajaj did, in fact, request a reasonable accommodation—permitting her to telework for four weeks, notwithstanding her OIN.  But is also shows that HUD granted that request.  Dkt. 34-1 at 18 (SUMF Resp. ¶ 68); Dkt. 30-46 at 1–2.  In an email chain that included Bajaj, her union representative requested that the Deputy Assistant Secretary for HUD's Real Estate Assessment Center review her reasonable accommodation request, and the Deputy Assistant Secretary replied: "I am considering your request and will grant the four weeks of

---

that "South Indians and North Indians . . . are totally different."  Dkt. 30-2 at 51 (Bajaj Dep. 51:15–16).  She also has not demonstrated that she was "similarly situated" to any other employees who received preferable treatment.

reasonable accommodation that is requested." Dkt. 30-46 at 2. And leaving no doubt that Bajaj received actual notice of that decision, she responded to a separate portion of the email, which warned her that a new OIN was coming. *Id.* at 1.

When confronted with this *approval* at deposition, Bajaj at first claimed that she was not sent the email by Evans or Portanova and, then, that it was sent to her official email and that "they knew that [she] didn't have an access to that email." Dkt. 30-2 at 130–31 (Bajaj Dep. 130:23–131:5). She then expressed surprise when informed that she had responded to the email, asking "What did I write?" *Id.* at 131 (Bajaj Dep. 131:12). After being shown her email, she continued to resist, asserting: "They put it on paper to save themselves but did not tell me that you have got that and you can – you got your approval for reasonable accommodation." *Id.* at 132 (Bajaj Dep. 132:2–4). When asked whether the parties could "agree that you actually got your four weeks of . . . reasonable accommodation?" Bajaj responded: "No. Only on paper. I did not." *Id.* (Bajaj Dep. 132:21–25).

"To create an issue for the jury," the plaintiff must "produce sufficient evidence" demonstrating that, after requesting an accommodation, the defendant "refused to make an accommodation." *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308 (D.C. Cir. 2010). Here, the irrefutable documentary evidence shows that Bajaj, in fact, received the accommodation that she requested. She offers no evidence indicating that email chain is inauthentic. or that it was fabricated to hide the fact that her request was actually denied, or that she was even denied an accommodation. Nor do subsequent events belie the fact that Bajaj received the accommodation that she requested. As explained above, the day after Bajaj's accommodation request was approved, she received her second OIN and, in response, announced that she would "be on leave indefinitely." Dkt. 30-47. As a result—based on her own, intervening decision—Bajaj was

never able to take advantage of her accommodation to telework—emphasis on "work"—for four weeks.  Bajaj's insistence that the email granting her request is a "lie" is difficult to fathom, and, in any event, it does not constitute evidence that would permit a reasonable jury to find that, despite every indication to the contrary, her request was actually denied.

The Court will, accordingly, grant summary judgment in favor of Defendants on Bajaj's failure to accommodate claim.

## G.    Hostile Work Environment

Bajaj further alleges that Defendants "subjected [her] to a hostile work environment" in violation of Title VII, the ADA, and the Rehabilitation Act. Dkt. 32 at 31; Dkt. 1 at 11–12 (Compl. ¶¶ 52–61).  In particular, she alleges that she was "subjected to repeated unwelcome conduct, threats, belittling, and humiliation based on her membership in certain protected class[es]" and that the harassment "was intended to interfere with [her] work performance" and did so "interfere." Dkt. 1 at 11 (Compl. ¶¶ 54–56).

To prevail on a hostile work environment claim, "a plaintiff must show that h[er] employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To qualify, the workplace must be "both objectively and subjectively offensive;" it must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  "[T]o determine whether an environment is sufficiently hostile or abusive," the Court must "'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 787–88 (quoting *Harris*, 510 U.S. at 23).

Neither Title VII nor the ADEA nor the Rehabilitation Act, however, imposes a "general civility code," *Faragher*, 524 U.S. at 788 (internal quotations omitted), and, in general, "a few isolated incidents of offensive conduct [will] not amount to actionable harassment," *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *Harris v. Wackenhut Servs.*, Inc., 419 F. App'x 1, 1 (D.C. Cir. 2011) (holding that "three racially motivated comments directed at [the plaintiff] . . . 'd[id] not amount to actionable harassment'" (citation omitted)).   A hostile-work-environment plaintiff, moreover, must show that "the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . because of" the employee's protected status. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks omitted); *Harris*, 419 F. App'x at 2 (conduct or statements that "bear[] no connection to [the plaintiff's race . . . cannot support a hostile work environment claim" (citing *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002)).

Here, Bajaj describes a series of incidents that she alleges occurred and created a hostile work environment, including: (1) when Evans "scream[ed] at Bajaj during meetings;" (2) when Dennis allegedly stalked Bajaj; (3) when Krapf made "vulgar gestures" towards Bajaj; and (4) when Evans made derogatory statements about women and people of color in front of her.  Even accepting the truth of these allegations, however, they are insufficient as a matter of law.

The bar for a hostile work environment claim is a high one, and harsh, rude, and demeaning conduct, even if troubling, is not alone sufficient, especially when much of the conduct is disconnected from the plaintiff's protected status.  *See Heavans v. Dodaro*, 648 F. Supp. 3d 1, 18 (D.D.C. 2022) ("As the Supreme Court put it, '[t]hese standards for judging

hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'  Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace.'" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998))).  Bajaj alleges that Evans screamed at her and that Dennis stalked her, for example.  But neither of these allegations includes any nexus to Bajaj's age, gender, national origin, or disability.  Indeed, she does not even reveal what Evans alleged said when he screamed at her, *see, e.g.*, Dkt. 34-1 at 23 (SUMF Resp. ¶ 4) ("Mr. Evans would scream at Ms. Bajaj during meetings to the extent that other employees would be disturbed and have to close Mr. Evans' office door to block the screaming."); Dkt. 30-17 at 1 ("A Person [referring to Evans] who comes to my cubicle, yells, screams, curses, intimidates is not unprofessional. Right?"), and she offers no reason whatsoever to infer that Dennis allegedly "stalked" her based on some undefined discriminatory animus.  Moreover, even if Bajaj could connect these alleged incidents to a protected status or characteristic, they do not rise to the level necessary to prevail on a hostile work environment claim.  *See Baloch*, 550 F.3d at 1201; *Fields v. Vilsack*, 207 F. Supp. 3d 80, 94 (D.D.C. 2016) ("In short, even assuming that [the plaintiff's supervisor] 'screamed' at [the plaintiff] and forcefully slammed the door to his office, that episode—although regrettable—was neither 'severe' nor 'pervasive'").

Bajaj allegations that Krapf made vulgar gestures towards her and that Evans made disparaging comments about women of color on two occasions come closer to the mark, but also fail to clear the high hurdle for prevailing on a hostile work environment claim.  To start, perhaps based on understandable sensibilities, Bajaj has refused to describe the allegedly offensive gesture that she attributes to Krapf.  *See* Dkt. 30-2 at 32 (Bajaj Dep. 32:19–22) ("I cannot demonstrate the way he was moving.  He was moving his hands up and down in places he should

not be moving his hands.  I don't know.  That made me very uncomfortable.").  But even if understandable, that leaves the Court—and would leave the jury—in the dark, and it makes it difficult for Defendants to respond to the contention.  And, in any event, whatever may (or may not) have happened, it was almost certainly insufficient to establish that the workplace was severely or pervasively hostile.  *See Fields*, 207 F. Supp. 3d at 94.

Finally, even assuming that Evans made the statements that Bajaj attributes to him regarding women of color, the Court cannot conclude that those isolated statements—even if made by a supervisor at some unspecified time—were sufficiently severe to create a hostile work environment.  Although statements of the type that Bajaj alleges Evans made are undoubtedly inappropriate and offensive, the law requires more than "a few isolated incidents of offensive conduct" to prevail on a hostile work environment claim.  *Stewart*, 275 F.3d at 1134.  Instead, the law requires an environment that is "permeated" with "discriminatory intimidation, ridicule, and insult."  *Harris*, 510 U.S. at 21; *Baloch*, 550 F.3d at 1201("[Plaintiff's] assertion of pervasive and constant abuse is undermined by the sporadic nature of the conflicts."); *Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 228 (D.D.C. 2015) ("[A] handful of comments over the course of several years cannot meet the pervasiveness threshold."); *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (finding hostile work environment could be premised on supervisor's one-time use of "a deeply offensive racial epithet").  Here, even accepting Bajaj's allegations as true, she cannot meet that demanding standard.[6]

---

[6] To the extent Bajaj alleges that her discrimination and retaliation claims (including her work assignments, training, and leave) should also be considered in conjunction with her hostile work environment claim, those work-related incidents are insufficient to create a triable issue of fact as to Bajaj's hostile work environment claim. *See, e.g.*, *Fields*, 207 F. Supp. 3d at 95 ("Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because [d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a

The Court will, accordingly, grant summary judgment in favor Defendants on Bajaj's hostile work environment claim.

## H.    Constructive Discharge

Finally, Bajaj alleges that she was constructively discharged based on the "continuing, severe harassment, retaliation, and discrimination," "humiliat[ion]," "stalk[ing]," and "intimidat[ion]" that she faced.  Dkt. 1 at 14–15 (Compl. ¶¶ 70–79).

To prevail on her constructive discharge claim, Bajaj must show that "that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment." *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 102 (D.D.C. 2011) (quoting *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 81 (D.D.C. 2009)).  In this circuit, "a 'finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee' out." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981)).  Proving a constructive discharge claim therefore requires a "finding of discrimination and the existence of certain 'aggravating factors.'" *Id.*  The Court, once again, concludes that Bajaj has failed to identify evidence sufficient to establish a triable issue of act.

Most notably, Bajaj's constructive discharge claim merely recycles the arguments addressed and rejected above.  She relies on the same allegations that she invokes in support of her hostile work environment claim, including alleged comments or intimidation relating to her

---

hostile work environment claim.") (internal quotation marks and citation omitted); *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) ("Allegations of undesirable job assignments or modified job functions . . . are not sufficient to establish that [the plaintiff's] work environment was permeated with discriminatory intimidation, ridicule, and insult.") (internal quotation marks and citation omitted).

accent and gender, and Dennis allegedly stalking her at the office. Dkt. 1 at 14–15 (Compl. ¶¶ 72–75). To prevail on a constructive discharge claim, however, "the plaintiff must 'demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.'" *Brown v. D.C.*, 768 F. Supp. 2d 94, 101 (D.D.C. 2011), *aff'd*, 493 F. App'x 110 (D.C. Cir. 2012) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992)). The Court, moreover, has also already rejected Bajaj's discrimination and retaliation claims, leaving no "discriminatory [or retaliatory] acts upon which [she] could rest [her] constructive discharge claim." *Mungin*, 116 F.3d at 1558. But even if Bajaj were able to establish a triable issue of fact with respect to one or more of her various discrimination and retaliation claims, more is required to go to trial on a constructive discharge claim. She must identify "record evidence that [Defendants] subjected [her] to an 'abusive working environment'" that is a product of discriminatory or retaliatory animus and that is "so intolerable that [her] resignation qualified as a fitting response." *Fiacco v. Dep't of Veteran Affairs*, No. 19-cv-3714, 2024 WL 4298616, at *6 (D.D.C. Sept. 26, 2024) (quoting *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008)). Here, the vast majority of Bajaj's complaints about her workplace had no apparent relationship to her sex, race, nationality, age, disability, or protected activity, and those incidents that included some such alleged nexus do not rise to the level required to go to trial on a constructive discharge claim.

The Court will, accordingly, grant summary judgment is favor of Defendants on Bajaj's constructive discharge claim.

**CONCLUSION**

For the foregoing reasons, the Court will **GRANT** Defendants' motion for summary

judgment, Dkt. 30.

A separate order shall issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 18, 2025